IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRCT OF OHIO
EASTERN DIVISION

REBECCA J. GERBER,           )
                             )    CASE NO.  5:19-CV-00002-JG
         Plaintiff,          )
                             )    JUDGE JAMES GWIN
    vs.                      )
                             )    MAGISTRATE JUDGE
COMMISSIONER OF SOCIAL       )    JONATHAN D. GREENBERG
SECURITY,                    )
                             )    **REPORT & RECOMMENDATION**
         Defendant.          )


Plaintiff, Rebecca Gerber ("Plaintiff" or "Gerber"), challenges the final decision of Defendant, Andrew Saul,[1] Commissioner of Social Security ("Commissioner"), denying her applications for a Period of Disability ("POD") and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be VACATED AND REMANDED for further consideration consistent with this opinion.

## I.    PROCEDURAL HISTORY

In June 2016, Gerber filed an application for POD and DIB, alleging a disability onset date of May 31, 2016 and claiming she was disabled due to chronic back pain, bulging disc, and difficulty walking, standing, and sitting for long.  (Transcript ("Tr.") 151.)  The application was denied initially

---

[1] On June 17, 2019, Andrew Saul became the Commissioner of Social Security.

and upon reconsideration, and Gerber requested a hearing before an administrative law judge ("ALJ").
(*Id.* at 14.)

On April 16, 2018, an ALJ held a hearing, during which Gerber, represented by counsel, and an
impartial vocational expert ("VE") testified.  (*Id.*)  On May 9, 2018, the ALJ issued a written decision
finding Gerber was not disabled.  (*Id.* at 14-21.)  The ALJ's decision became final on November 6,
2018, when the Appeals Council declined further review.  (*Id.* at 1-8.)

On January 2, 2019, Gerber filed her Complaint to challenge the Commissioner's final decision.
(Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 14, 16, 17.)  Gerber asserts
the following assignments of error:

(1)     The ALJ failed to evaluate properly the opinion of Dr. Paul Hartzfeld, Gerber's treating
         neurosurgeon;

(2)     The ALJ should have more thoroughly evaluated Listing 1.04 in the decision;

(3)     The ALJ's residual functional capacity ("RFC") finding lacked substantial evidence;

(4)     The ALJ's subjective symptom determination lacked substantial evidence and violated
         Social Security Ruling ("SSR") 16-3p; and

(5)     The ALJ failed to meet his burden at Step Five of the sequential evaluation.

(Doc. No. 14.)[2]

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Gerber was born in November 1964 and was 53 years old at the time of her administrative
hearing (Tr. 20), making her a "person closely approaching advanced age" under Social Security

---

[2] Gerber only raised issue numbers (1), (4), and (5) in the "Legal Issues" portion of her brief.
(Doc. No. 14 at 1.)  Gerber raised issue numbers (2) and (3) within the body of her brief in the
section regarding the ALJ's evaluation of Dr. Hartzfeld's opinion.  (*Id.* at 14-15.)  The
Commissioner specifically responded to Gerber's listing argument but did not explicitly respond
to Gerber's argument that the RFC lacked substantial evidence.  (Doc. No. 16.)

regulations.  *See* 20 C.F.R. § 404.1563(d).  She has at least a high school education and is able to communicate in English.  (Tr. 20.)  She has past relevant work as Licensed Practical Nurse.  (*Id*. at 19.)

## B.    Medical Evidence[3]

In June 2015, Gerber underwent chiropractic treatment for her neck and upper back pain, numbness, and tingling.  (*Id.* at 206.)  Her symptoms occurred daily, although they were intermittent, and were worse when she was working and better with rest.  (*Id.*)

On April 12, 2016, Gerber saw Dr. Freeland Oliverio complaining of back pain.  (*Id.* at 211.)  Dr. Oliverio noted Gerber walked normally, had normal tone and muscle strength, and normal gait and station.  (*Id.* at 213-14.)  Positive examination findings included tenderness and limited range of motion.  (*Id.* at 214.)  Dr. Oliverio noted Gerber had "chronic low back pain with a pain level of 6/10" and that Gerber complained of bilateral leg numbness.  (*Id.*)  He refilled her pain medication for her chronic low back pain.  (*Id.*)

A May 12, 2016 MRI of Gerber's lumbar spine revealed small bilateral foraminal protrusions at L2-L3, a disc bulge with a superimposed left paracentral and foraminal extrusion at L3-L4, status post bilateral laminectomies and posterior fusion at L4-L5, and minimal retrolisthesis at L5-S1 with a small disc bulge.  (*Id*. at 233-34.) The conclusion was that she was status post bilateral laminectomies and posterior fusion at L4-L5 and had multilevel degenerative changes with "resultant mild central canal, mild to moderate right lateral recess, moderate to severe left lateral recess, moderate left foraminal, and mild right foraminal stenosis."  (*Id*. at 234.)

---

[3] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

On May 26, 2016, Gerber saw Dr. Oliverio for poison ivy on her face.  (*Id.* at 208.)  Dr. Oliverio noted Gerber was walking normally.  (*Id.* at 210.)  Examination findings included normal tone and muscle strength, no tenderness, normal movement of all extremities, and normal gait and station.  (*Id.*)

On June 2, 2016, Gerber met with Dr. Paul Hartzfeld of the Neurosurgery and Spine Group for the first time.  (*Id.* at 241-243.)  Gerber complained of lower back pain, leg pain, and leg weakness.  (*Id.* at 241.)  The pain in her left leg was new, although the pain in her right leg had been present since her back surgery in 2002.  (*Id.*)  Her back pain had worsened over the past few years, but especially the last six months.  (*Id.*)  Gerber told Dr. Hartzfeld prolonged standing and walking aggravated her pain.  (*Id.*)  Associated symptoms consisted of numbness and leg weakness.  (*Id.*)  She had previously used a TENS unit, massage therapy, and stretching to treat her symptoms.  (*Id.*)  Dr. Hartzfeld reviewed Gerber's May 2016 MRI and noted she had a "left-sided L3 L4 disc bulge in contact with the traversing root." (*Id.* at 242.)  Dr. Hartzfeld's examination revealed a steady gait, the ability to walk on heels and toes, negative straight leg raise test, and 4+/5 muscle strength in her legs.  (*Id.*)  Positive examination findings included moderate limitation in Gerber's lumbar range of motion in all directions.  (*Id.*)  Dr. Hartzfeld proposed the following treatment plan: "She may ultimately need an L3 laminectomy with extension of refusing to the L3 L4 level.  She's not tried any conservative treatment, [sic] I gave her a prescription for physical therapy as well as flexion extension films of the lumbar spine." (*Id.*)  If physical therapy did not help, Dr. Hartzfeld would consider epidural cortisone shots before surgery. (*Id.*)

A June 7, 2016 x-ray of the lumbar spine revealed minimal grade 1 retrolithesis of L3 on L4 and L2 on L3, without significant change on flexion and extension, and facet arthrosis of the lower lumbar spine.  (*Id.* at 251-52.)

On June 21, 2016, Dr. Hartzfeld completed an assessment of Gerber's work-related limitations. (*Id.* at 246-47.)  Dr. Hartzfeld opined Gerber had the following limitations:

4

- She could lift and/or carry no more than five to ten pounds;

- She could stand and/or walk up to two hours without interruption, although Dr. Hartzfeld left blank how many total hours out of an eight-hour workday Gerber could stand and/or walk;

- She could sit for two to three hours total out of an eight-hour workday, and could sit for two hours without interruption;

- She had no postural or environmental limitations;

- She would be off task about twenty percent of an eight-hour workday due to pain or fatigue;

- She would need to lie down for thirty minutes throughout the course of an eight-hour workday; and

- She would need about three unscheduled breaks per day.

(*Id.* at 246-47.)

On July 7, 2016, Gerber again saw Dr. Hartzfeld for complaints of lower back pain, leg pain, and leg weakness.  (*Id.* at 248.)  The pain radiated to both legs with the left being worse.  (*Id.*).  Gerber told Dr. Hartzfeld that she was feeling better since she had stopped working and started physical therapy.  (*Id.*)  Dr. Hartzfeld noted the June 2016 lumbar x-ray revealed spondylolisthesis at L3-L4.  (*Id.* at 249.)  Dr. Hartzfeld's examination revealed a steady gait, the ability to walk on heels and toes, negative straight leg raise test, and 5/5 muscle strength in her legs.  (*Id.*)  Positive examination findings included moderate limitation in Gerber's range of motion in all directions.  (*Id.*)  Dr. Hartzfeld wrote the following under Gerber's treatment plan:

> Lumbar degenerative disc disease, adjacent segment stenosis.  She may ultimately need an L3 laminectomy with extension of her fusion L3 L4.  However we are trying to avoid this or at least delay it.  I agree with her physical therapy, she also mentioned that she would like to work on weight loss.  Today I gave her a referral to a dietician is medically necessary to have weight loss to help treat her back pain and hopefully avoid surgery.  She will contact my office as she progresses if she would like to further consider surgery.

5

(*Id.*)

On July 8, 2016, Gerber met with Dr. Oliverio to complete disability paperwork.  (*Id.* at 259-262.)  Gerber's diagnoses included chronic low back pain, lumbar radiculopathy, and that she was overweight.  (*Id.* at 261.)  Dr. Oliverio noted Gerber walked normally and had normal tone, motor strength, gait, and station.  (*Id.*)  Positive exam findings included tenderness, limited range of motion, and pain in her lumbar region.  (*Id.*)  Dr. Oliverio described Gerber as "chronically ill" as a result of her "lumbar region pain."  (*Id.*)

On September 29, 2016, Gerber saw Dr. Oliverio for medication refills and a complaint of numbness in her left thigh down to her knee.  (*Id.* at 266.)  Gerber told Dr. Oliverio she had been experiencing burning and tingling in her left leg radiating to her knee for the past two weeks.  (*Id.* at 268.)  On examination, Dr. Oliverio found Gerber to be walking normally and she had normal tone, motor strength, gait, and station.  (*Id.* at 267-68.)  Positive exam findings included tenderness and limited range of motion.  (*Id.* at 268.)  Dr. Oliverio refilled Gerber's pain medication and prescribed Gabapentin for neuropathy.  (*Id.*)

On December 28, 2016, Gerber again saw Dr. Oliverio for refills.  (*Id.* at 270-73.)  On examination, Dr. Oliverio found Gerber to be walking normally, with normal tone, motor strength, gait, and station.  (*Id.* at 272.)  Positive exam findings included tenderness and limited range of motion.  (*Id.*)  Dr. Oliverio again refilled Gerber's pain medication.  (*Id.*)

On March 23, 2017, Gerber saw Dr. Hartzfeld for a follow up visit.  (*Id.* at 274-76.)  She was doing better but wanted to try physical therapy.  (*Id.* at 274.)  While Gerber's symptoms improved once she stopped working, she was still "bothered" by symptoms in her left leg.  (*Id.*)  She wanted to try physical therapy and a Medrol dose pack.  (*Id.*)  Dr. Hartzfeld noted Gerber "realize[d] she will likely need surgery at some point in the future."  (*Id.*)  On examination, Dr. Hartzfeld found Gerber had a

6

steady gait, could walk on heels and toes, had 5/5 muscle strength in her legs, and had a negative straight leg raise test.  (*Id.* at 275.)  Positive examination findings included a moderate limitation in Gerber's lumbar spine range of motion in all directions.  (*Id.*)  Dr. Hartzeld prescribed physical therapy and a Medrol dose pack.  (*Id.*)  Gerber was to follow up with him "in the future [when] her symptoms have progressed to where she's ready for surgery."  (*Id.*)

A June 6, 2017 MRI revealed the following: mild concentric disc bulge with mild bilateral foraminal stenosis at L2-L3; mild to moderate loss of height of the intervertebral disc with a 2 mm grade 1 retrolisthesis and a moderate left paracentral disc extrusion with mass effect on the left L4 nerve root at L3-L4; severe loss of height of intervertebral disc and mild concentric disc osteophyte complex with mild to moderate bilateral foraminal stenosis at L4-L5; and mild to moderate loss of height of intervertebral disc and mild to moderate size concentric bulge with mild to moderate bilateral foraminal stenosis at L5-S1.  (*Id.* at 285.)  The radiologist concluded there was a grade 1 retrolisthesis and a moderate sized left paracentral disc extrusion with mass effect on the left L4 nerve root, postsurgical changes at L4-L5 and L5-S1, and mild convex dextroscoliosis.  (*Id.* at 286.)

On June 22, 2017, Gerber saw Dr. Hartzfeld for a follow-up appointment.  (*Id.* at 341.)  She did not do psychical therapy because of the cost, but the Medrol helped.  (*Id.*)  Dr. Hartzfeld reviewed the June 6, 2017 MRI and noted that the imaging shows "postop changes L4 S1" and a "large disk herniation" at L3-L4 on the left.  (*Id.* at 342.)  On examination, Gerber had a steady gait, could walk on heels and toes, had a negative straight leg raise test bilaterally, and 5/5 muscle strength in her legs.  (*Id.*)  Positive exam findings included moderate limitation of her lumbar spine range of motion in all directions.  (*Id.*)  Dr. Hartzfeld recommended an L3 laminectomy with left L3 L4 discectomy, and extension of her fusion to the L3 L4 level.  (*Id.*)  Dr. Hartzfeld noted Gerber was considering her options and would contact his office if she wanted to proceed with surgery.  (*Id.*)

7

On June 29, 2017, Gerber saw Dr. Oliverio for refills and a review of her MRI results from Dr. Hartzfeld.  (*Id.* at 283.)  Dr. Oliverio noted Dr. Hartzfeld recommended Gerber have another back surgery.  (*Id.*)  On examination, Dr. Oliverio found Gerber was walking normally and had normal tone, motor strength, gait, and station.  (*Id.* at 282.)  Dr. Oliverio determined Gerber's MRI "showed lumbar retrolisthesis and worsening changes of the lumbar spine."  (*Id.*)

Gerber underwent alternative treatment for her back pain, including acupuncture and yoga.  (*Id.* at 311-36.)  In September 2017, Gerber was getting 7,000 steps a day but 10,000 caused pain.  (*Id.* at 334.)  Her back got tense at night and woke her around 4 a.m.  (*Id.*)  She was also getting cramps in her feet.  (*Id.*)  She complained of pain straight across her low back, throbbing leg pain, some numbness in her right leg down to her toes, and leg weakness.  (*Id.*)  She felt like her legs might give out climbing steps or hiking.  (*Id.*)  Later that month, Gerber had been working in her son's 100-year-old house.  (*Id.* at 328.)  She rated her lateral thigh pain at a 3/10 after a lot of movement over the weekend.  (*Id.*)  Her low back felt tight, but she had no lower back pain or pain in her glutes.  (*Id.*)  In October 2017, Gerber's pain was improving, although it was aggravated by picking up her disabled grandchild.  (*Id.* at 326.)  Later that month, Gerber felt more tightness than pain and her outer thigh pain was almost gone.  (*Id.* at 323.)  She had done a lot of yard work the Friday before and had been tight since then.  (*Id.*)  Gerber was also experiencing weakness in her hip when rising and was also having some right knee pain.  (*Id.*)  She had not been working in her son's house.  (*Id.*)  In November 2017, Gerber felt stiff all the time and had a lot of neck and upper back pain the night before her appointment.  (*Id.* at 320.)  She moved better since she wasn't working anymore.  (*Id.*)  She was also experiencing anterior thigh weakness.  (*Id.*)

On November 13, 2017, Gerber saw Dr. Oliverio for medication refills and back pain.  (*Id.* at 347.)  She complained of low back pain, as she did not see her acupuncturist until the 27th.  (*Id.*)  On

examination, Dr. Oliverio found Gerber walked normally and normal tone, motor strength, gait, and station. (*Id.* at 349.)  Positive exam findings included tenderness and limited range of motion. (*Id.*)  Dr. Oliverio noted undergoing acupuncture "has helped [Gerber] tremendously." (*Id.*)  Dr. Oliverio gave Gerber prednisone and tramadol and instructed her to take her medication as needed. (*Id.* at 350.)

On December 18, 2017, Gerber saw her naturopath and stated acupuncture helped her long-term back pain. (*Id.* at 316.)  At this visit, she said she had not eaten well, and her pain was terrible. (*Id.*)  She mentioned work had been hard on her pain. (*Id.*)  She had been walking some. (*Id.*)  She felt stiff in the morning until she started moving. (*Id.*)  Her pain became worse while sitting or standing in one place. (*Id.*)  She was experiencing stiffness in her back and neck, and sometimes in her right knee or hand. (*Id.*)  While she loved to cook, she was unhappy with her weight. (*Id.*)  She started gaining weight after she stopped working and being in pain. (*Id.*)  Under the "Emotions" section of the naturopath's treatment notes, the naturopath noted Gerber liked to mow and work outside. (*Id.*)

On January 17, 2018, Gerber again saw her naturopath. (*Id.* at 311.)  Gerber stated she was doing better and was feeling good after acupuncture but bending over really bothered her and she was a little disappointed with her back. (*Id.*)  She still felt pain straight across her low back. (*Id.*)  A heating pad helped her low back pain. (*Id.*)  She also did yoga one to two times a day to stretch and had been doing squats. (*Id.*)

On March 2, 2018, Gerber saw Dr. Hartzfeld for another follow up. (*Id.* at 338.)  She was doing the same overall, was debating surgery, and had disability paperwork to be completed. (*Id.*)  On examination, Dr. Hartzfeld found Gerber had a steady gait, could walk on heels and toes, had a negative straight leg raise test, and had 5/5 muscle strength in her legs. (*Id.* at 339.)  Positive examination findings included moderate limitation in Gerber's lumbar spine range of motion in all directions. (*Id.*)  Dr. Hartzfeld recommended "an L3 L4 decompression with extension of fusion." (*Id.*)  Gerber told Dr.

Hartzfeld she was working on getting Medical Mutual insurance and would contact his office once she had the insurance to schedule surgery.  (*Id.*)

## C.    State Agency Reports

On August 14, 2016, Leanne Bertani, M.D., opined Gerber possessed the RFC to perform light work with the following additional limitations: (1) occasionally climb ramps or stairs, stoop, and crawl; (2) never climb ladders, ropes, or scaffolds; (3) frequently balance, kneel, and crouch; and (4) avoid concentrated exposure to hazards.  (*Id.* at 55-56, 58-59.)

On October 21, 2016, Leon Hughes, M.D., opined identical findings on reconsideration as Dr. Bertani found on initial review.  (*Id.* at 67-68, 70-71.)

## D.    Hearing Testimony

During the April 16, 2018 hearing, Gerber testified to the following:

- Gerber lives with her husband in a "Cape" style house with everything she uses, including her bathroom, bedroom, kitchen, and laundry, on the first floor.  (Tr. 32, 40.)  She has three adult children.  (*Id.* at 33.)

- She has constant pain in her left leg and lower back.  (*Id.* at 33.)  The most severe pain is in her left front leg.  (*Id.* at 41.)  Gerber uses acupuncture, a TENS unit, heat, and elevating her legs to relieve her pain.  (*Id.* at 34.)  She elevates her legs a lot during the day.  (*Id.*)  At night, she doesn't sleep all night in her bed; at around 3:00-4:00 a.m. she gets up and goes to her recliner, where she gets another two hours of sleep.  (*Id.* at 34-35.)  At the time of the hearing, she was taking "800 Motrins," 4 milligram Tizanidine, and Prednisone.  (*Id.* at 33.)  She was no longer taking Vicodin as her surgeon would not give her anymore until she had surgery.  (*Id.*)  At the time of the hearing, she was still waiting on approval for her back surgery from her insurance company.  (*Id.* at 40.)  She gets stomachaches if she takes too much Motrin.  (*Id.* at 33.)

- Gerber also gets a lot of numbness in her legs, and the left leg is worse than the right.  (*Id.* at 38.)

- She could be on her feet for two hours at the most before she would need to take a break, although she had not stood that long in a while.  (*Id.* at 34, 38-39.)  She cannot sit for long periods of time because it hurts her back and her leg goes numb.  (*Id.* at 34.)  She thought she could sit for an hour.  (*Id.* at 35.)

- During the day, she reads and mends clothes.  (*Id.* at 36.)  When she is reading or mending, she sits in her recliner with her legs elevated at hip height.  (*Id.* at 38.)  She also does some laundry.  (*Id.* at 36.)  She cooks sometimes, but her husband does most of the cooking.  (*Id.*)  She occasionally washes dishes and loads the dishwasher.  (*Id.* at 39.)  She can stand at the sink for about half an hour, and then she gets a burning pain down the front of her leg and needs to sit.  (*Id.*)

- She grocery shops once a week by herself, but she shops at a place where the employees load the groceries in her car.  (*Id.* at 36.)  She usually leaves the groceries in her car and her husband brings them in.  (*Id.*)  Her leg goes numb after her half hour trip through the grocery store.  (*Id.* at 39.)

- She has a driver's license and does not have problem driving short distances.  (*Id.* at 32, 37.)

- She visits her mother, who lives five minutes away, and her children, who live 15-20 minutes away, on a regular basis.  (*Id.* at 37.)  About twice a month she goes to her grandchild's sporting events.  (*Id.*)  She attends church two to three times a month.  (*Id.*)  She had gone to a couple of business dinners with her husband.  (*Id.*)

- She did not believe she could work unless she had surgery, as she cannot stand or sit for long and her leg gets numb and burns.  (*Id.* at 41.)

The ALJ excluded Gerber's past work on the exertional level.  (*Id.* at 43.)  For purposes of his hypotheticals, the ALJ asked the VE to consider a person born in November 1964 with a high school education.  (*Id.*)  The ALJ then posed the following hypothetical question to the VE:

> [P]lease consider an individual that can lift, carry, push, and pull 20 pounds occasionally and ten frequently.  This individual can sit for six hours, stand and/or walk for six hours in a normal workday.  This person cannot climb ladders, ropes or scaffolds.  And can occasionally climb ramps and stairs.  This person can frequently balance, kneel and crouch.  This person can occasionally stoop and crawl.  This person must avoid workplace hazards such as unprotected heights or exposure to dangerous moving machinery.

(*Id.*)

The VE testified the hypothetical individual would be able to perform other representative jobs in the economy, such as small product assembler, labeler/marker, and office cleaner. (*Id.* at 44.)

The ALJ then asked the VE to add the following to his first hypothetical: "[I]n addition to normal breaks and a normal lunch period, the individual would require three additional breaks each lasting 15

11

minutes at unscheduled, unannounced times throughout the workday to deal with pain . . . ." (*Id.*) The VE testified such extra breaks "at best would require a special accommodation" and were inconsistent with competitive work. (*Id.*) The ALJ then asked the VE to add the following to his first hypothetical: "[T]he individual would be off task 20% of the time because of pain . . . ." (*Id.*) The VE testified the maximum time off task would be 10%, so 20% would preclude competitive employment. (*Id.*)

On cross-examination, Gerber's counsel asked the VE if light work would be precluded where a person could only stand for half an hour and then would need to sit for half an hour. (*Id.* at 45.) The VE testified that amount of time up and down would preclude light work. (*Id.*)

The ALJ informed counsel that he did not ask the VE any sedentary level questions as Gerber would "grid out" under the regulations at a sedentary exertional level. (*Id.*)

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, and 404.1505(a).1

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of

12

the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d).   Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Gerber was insured on her alleged disability onset date, May 31, 2016, and remains insured through December 31, 2020, her date last insured ("DLI.")  (Tr. 16.) Therefore, in order to be entitled to POD and DIB, Gerber must establish a continuous twelve-month period of disability commencing between these dates.  Any discontinuity in the twelve-month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.  SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2020.

13

2.      The claimant has not engaged in substantial gainful activity since May 31, 2016, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.      The claimant has the following severe impairments: degenerative disc disease, and peripheral neuropathy (20 CFR 404.1520(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526.)

5.      After careful consideration of the entire record, I find that the claimant has the [RFC] to perform light work as defined in 20 CFR 404.1567(b) except that she can occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds. She can frequently balance, kneel, and crouch.  She can occasionally stoop and crawl.  The claimant must avoid workplace hazards such as unprotected heights and dangerous moving machinery.

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.      The claimant was born on November **, 1964 and was 51 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and [RFC], there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from May 31, 2016, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 16-21.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)."  *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision

14

is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy*, 594 F.3d at 512; *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White*, 572 F.3d at 281; *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be

15

upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

### A.      First Assignment of Error: Treating Source Opinion

Gerber argues the ALJ erred in assigning little weight to the June 2016 opinion of treating neurosurgeon Dr. Hartzfeld.  (Doc. No. 14 at 10.)  Gerber asserts the ALJ failed to give "good reasons" for the weight assigned to Dr. Hartzfeld's opinion.  (Doc. No 17 at 2-3.)  Gerber maintains the ALJ "ignor[ed] the deterioration of her condition and the fact that the treating neurosurgeon recommended surgery," which constitutes "harmful and reversible error" in this case."  (Doc. No. 14 at 11.)  Gerber also argues the state agency reviewing physicians' opinions should not have been given great weight "at the same time that Dr. Hartzfeld's opinion was given little weight."  (*Id.* at 14.)

The Commissioner argues the ALJ "reasonably gave little weight to Dr. Hartzfeld's opinion" as it was inconsistent with the treatment notes and based on a single examination.  (Doc. No. 16 at 8.)

As the Sixth Circuit has explained, "'[t]he Commissioner has elected to impose certain standards on the treatment of medical source evidence.'"  *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013) (citing *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)).  Medical opinions are to be weighed by the process set forth in 20 C.F.R. § 404.1527(c), and "[t]he source of the opinion . . . dictates the process by which the Commissioner accords it weight."  *Id.*  "As a general matter, an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination (a 'nonexamining source'), *id.* § 404.1502, 404.1527(c)(1), and an opinion from a medical source who regularly treats the claimant (a 'treating source') is afforded more weight than that from a source who has examined the claimant but does not have an ongoing treatment relationship (a 'nontreating source'), *id.* § 404.1502, 404.1527(c)(2)."  *Id.*  In other words, "'the regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker.'"  *Gayheart*, 710 F.3d at 375 (quoting SSR No. 96–6p, 1996 WL 374180, at *2 (Soc. Sec. Admin. July 2, 1996)).[4]

A treating source opinion must be given "controlling weight" if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record."  *Gayheart*, 710 F.3d at 376; 20 C.F.R. § 404.1527(c)(2).  However, "a finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected."  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d

---

[4] Revised versions of these regulations took effect on March 27, 2017 and apply to disability claims filed on or after that date.  *See* 82 F. Reg. 5844 (March 27, 2017). SSR 96-6p has been rescinded and replaced by SSR 17-2p, effective March 27, 2017. *See* Soc. Sec. Rul. No. 17-2p, 2017 WL 3928306 at *1 (Soc. Sec. Admin. Mar. 27, 2017).

399 (6th Cir. 2009).  Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408.  *See also Gayheart*, 710 F.3d at 376 ("If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, *id.*, as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence, *id.* § 404.1527(c)(2)-(6).")

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007).  *See also Gayheart*, 710 F.3d at 376.  The purpose of this requirement is two-fold.  First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'"  *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)).  Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule."  *Wilson*, 378 F.3d at 544.  Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record."  *Rogers*, 486 F.3d at 243.

Nevertheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence.  *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir.

1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406. Moreover, the "treating physician rule" only applies to medical opinions. "If the treating physician instead submits an opinion on an issue reserved to the Commissioner—such as whether the claimant is disabled, unable to work, the claimant's RFC, or the application of vocational factors— [the ALJ] decision need only 'explain the consideration given to the treating source's opinion.'" *Johnson v. Comm'r of Soc. Sec.*, 535 F. App'x 498, 505 (6th Cir. 2013). The opinion, however, "is not entitled to any particular weight." *Turner*, 381 F. App'x at 493. *See also Curler v. Comm'r of Soc. Sec.*, 561 F. App'x 464, 471 (6th Cir. 2014).

The ALJ gave the following explanation for the weight assigned to Dr. Hartzfeld's opinion:

> I give little weight to this opinion, and it is not entitled to controlling weight, as it is simply not consistent with Dr. Hartzfeld's own treatment records. At the time he drafted this opinion, Dr. Hartzfeld had only seen the claimant for an initial evaluation, and offered a good prognosis. He found a moderate limitation in the range of motion of the lumbar spine, but noted a steady gait and negative straight leg raises. Dr. Hartzfeld recommended a conservative treatment course of physical therapy and epidural shots (3F/7.) This exam was not consistent with the rather extreme limitations described in his opinion, and that opinion is therefore entitled to little weight.

(Tr. 19.)[5]

The state agency reviewing physicians considered Dr. Hartzfeld's opinion on initial review and reconsideration. (*Id.* at 51, 64.) On initial review, Dr. Bertani found Dr. Hartzfeld's opinion

---

[5] Dr. Hartzfeld's opinion may not qualify as a treating source opinion under the law of this circuit. *See, e.g., Wright v. Colvin*, No. 1:15-cv-01931, 2016 WL 5661595, at *7 (N.D. Ohio Sept. 30, 2016) ("'Precedent in this Circuit suggests that a physician who treats an individual only twice of three times does not constitute a treating source.'") (quoting *Hickman v. Colvin*, 2014 U.S. Dist. LEXIS 82914 (M.D. Tenn. June 18, 2014) (collecting cases)). But the ALJ's analysis presupposed that Dr. Hartzfeld qualified as a treating source, as only treating source opinions are entitled to controlling weight. (Tr. 19.) The Commissioner does not argue that Dr. Hartzfeld did not constitute a treating source at the time he gave his opinion. As a result, the Court will assume for purposes of this opinion that Dr. Hartzfeld qualified as a treating source at the time he gave his 2016 opinion.

inconsistent with "his clinical exam findings that show claimant has steady gait without need for ambulatory aid," could "walk on heels and toes," has "moderate lumbar LOM in all directions," negative straight leg raise test bilaterally, "[m]oves all extremities," and has 4+/5 motor strength in her legs.  (*Id.* at 54.)   The initial Disability Determination Explanation also included the determination that Dr. Hartzfeld's opinion "relies heavily on the subjective report of symptoms and limitations provided by the individual, and the totality of the evidence does not support the opinion.   The opinion contains inconsistencies, rendering it less persuasive." (*Id.* at 57.)  Dr. Hughes offered the same conclusions as Dr. Bertani on reconsideration.  (*Id.* at 65-66.)[6]

The ALJ provided good reasons for assigning little weight to Dr. Hartzfeld's opinion.  While Gerber focuses on evidence in the record post-dating Dr. Hartzfeld's opinion, the ALJ discounted Dr. Hartzfeld's opinion based on the evidence at the time Dr. Hartzfeld gave it.  (*Id.* at 19.)  The record confirms  Dr. Hartzfeld had seen Gerber only one time before offering his opinion, and the ALJ accurately identified contradictory evidence in Dr. Hartzfeld's treatment notes from that single exam in support of the weight assigned to Dr. Hartzfeld's opinion.

At least as of the time Dr. Hartzfeld rendered his opinion, substantial evidence supports the ALJ's decision to give it little weight.   Therefore, the ALJ did not err in assigning little weight to Dr. Hartzfeld's opinion.

## B.     Second Assignment of Error: Listing 1.04

Gerber argues the ALJ should have more thoroughly evaluated Listing 1.04 given her 2017 MRI showing "a disc extrusion with mass effect on the left L4 nerve root" and the moderate limitation in Gerber's range of motion of her lumbar spine.  (Doc. No. 14 at 14-15.)  The Commissioner responds that

---

[6] The ALJ gave great weight to the state agency reviewing physicians' opinions.  (Tr. 19.)  The Court does not reach whether substantial evidence supports the ALJ's decision to give great weight to the state agency reviewing physicians' opinions considering record evidence after Dr. Hartzfeld rendered his opinion for the reasons set forth *infra*.

substantial evidence supports the ALJ's finding that Gerber does not meet Listing 1.04.  (Doc. No. 16 at 13-16.)

At the third step in the disability evaluation process, a claimant will be found disabled if her impairment meets or equals one of the Listing of Impairments.  20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 491 (6th Cir. 2010).  The Listing of Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the Social Security Administration considers to be "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience."  20 C.F.R. §§ 404.1525(a).  Essentially, a claimant who meets the requirements of a Listed Impairment, as well as the durational requirement, will be deemed conclusively disabled and entitled to benefits.

Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing."  20 C.F.R. §§ 404.1525(c)(3).  It is the claimant's burden to bring forth evidence to establish that her impairments meet or are medically equivalent to a listed impairment.  *See, e.g., Lett v. Colvin*, No. 1:13 CV 2517, 2015 WL 853425, at *16 (N.D. Ohio Feb. 26, 2015).  A claimant must satisfy all the criteria to "meet" the listing. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 653 (6th Cir. 2009). "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).  A claimant is also disabled if her impairment is the medical equivalent of a listing, 20 C.F.R. §§ 404.1525(c)(5), 416.925(c)(5), which means it is "at least equal in severity and duration to the criteria of any listed impairment."  20 C.F.R. §§ 404.1526(a), 416.926(a).

Where the record raises a "substantial question" as to whether a claimant could qualify as disabled under a listing, an ALJ must compare the medical evidence with the requirements for listed impairments in considering whether the condition is equivalent in severity to the medical findings for

any Listed Impairment.  *See Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414-15 (6th Cir. 2011). In order to conduct a meaningful review, the ALJ must make sufficiently clear the reasons for her decision. *Id.* at 416.

Moreover, "the ALJ's lack of adequate explanation at Step Three can constitute harmless error where the review of the decision as a whole leads to the conclusion that no reasonable fact finder, following the correct procedure, could have resolved the factual manner in another manner." *Lett*, 2015 WL 853425, at *16.  *See also Ford v. Comm'r of Soc. Sec.*, No. 13-CV-14478, 2015 WL 1119962, at *17 (E.D. Mich. March 11, 2015) (finding that "the ALJ's analysis does not need to be extensive if the claimant fails to produce evidence that he or she meets the Listing"); *Mowry v. Comm'r of Soc. Sec.*, No. 1:12-CV-2313, 2013 WL 6634300, at *8 (N.D. Ohio Dec. 17, 2013); *Hufstetler v. Comm'r of Soc. Sec.*, No. 1:10CV1196, 2011 WL 2461339, at *10 (N.D. Ohio June 17, 2011).

Here, the ALJ provided the following discussion at Step Three:

> First, I considered listing 1.04, Disorders of the spine.  In considering this listing, the undersigned looked to see whether the claimant's degenerative disc disease showed evidence of nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis.  Although the claimant has the severe impairment of degenerative disc disease, she nonetheless fails to meet listing 1.04, because the medical evidence does not include evidence of nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis. Moreover, the claimant's back disorder has not resulted in an inability to ambulate effectively, as defined in 1.00(B)(2)(b), since the claimant retains full range of motion of her lower extremities and is able to ambulate independently (5F/3, 5, Hearing).

(Tr. 17.)

Gerber's argument is not well taken, as she failed to raise a listing argument to the ALJ; the theory presented below was that Gerber should be found disabled at Step Five under Grid Rule 201.14.

(*Id.* at 200.)  *See, e.g., Wilson v. Comm'r of Soc. Sec.*, 618 F. App'x 281, 286 (6th Cir. 2015).[7]

Moreover, Gerber's listing argument to this Court is not that she meets or medically equals Listing 1.04;

rather, she argues that the 2017 MRI "should have resulted in a more thorough evaluation than provided

by the ALJ in his decision." (Doc. No. 14 at 14-15.) As the Sixth Circuit has explained:

> [A claimant] must do more than show that the ALJ's decision leaves open
> the question whether he meets [a] listing . . . he must show that the open
> question is a *substantial* one that justifies a remand. *Abbott*, 905 F.2d at
> 925. He has not done so.
>
> ***
>
> A substantial question about whether a claimant meets a listing requires
> more than what Sheeks has put forth here, a mere toehold in the record on
> an essential element of the listing.

*Sheeks v. Colvin*, 544 F. App'x 639, 641-42 (6th Cir. 2013). Here, the ALJ mentioned and discussed

Listing 1.04 in his analysis at Step Three. Gerber must do more than establish "a mere toehold in the

record on an essential element" of Listing 1.04 to warrant a remand, and she fails to do so here.

Furthermore, the Court finds substantial evidence supports the ALJ's conclusion Gerber does not

meet the requirements of Listing 1.04. Listing 1.04 governs disorders of the spine and requires the

spinal condition result "in compromise of a nerve root . . . or the spinal cord." 20 C.F.R. Part 404,

Subpart P, Appendix 1, § 1.04. Additionally, there must be:

> A. Evidence of nerve root compression characterized by neuro-anatomic
> distribution of pain, limitation of motion of the spine, motor loss (atrophy
> with associated muscle weakness or muscle weakness) *accompanied by*

---

[7] In *Wilson*, the ALJ failed to address whether the claimant met certain regulatory listings in his decision. 544 F. App'x at 646. The Sixth Circuit found the ALJ was "not obligated to discuss those specific listings" since Wilson failed to raise them below. *Id.* (citing *Malone v. Comm'r of Soc. Sec.*, 507 F. App'x 470, 472 (6th Cir. 2012) ("rejecting the claimant's assertion that the ALJ had to specifically discuss a particular listing where the claimant did not argue that he had a listed impairment at his administrative hearing"); *Walker v. Barnhart*, 72 F. App'x 355, 357 (6th Cir. 2003) ('holding that a claimant who did not assert a disability claim under a specific regulatory listing was 'not entitled to an award of benefits under that listing'")).

> *sensory or reflex loss and, if there is involvement of the lower back,*
> *positive straight-leg raising test (sitting and supine)*;
>
> or
>
> B. *Spinal arachnoiditis, confirmed by an operative note or pathology*
> *report of tissue biopsy, or by appropriate medically acceptable imaging,*
> manifested by severe burning or painful dysesthesia, resulting in the need
> for changes in position or posture more than once every 2 hours;
>
> or
>
> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by
> findings on appropriate medically acceptable imaging, manifested by
> chronic nonradicular pain and weakness, *and resulting in inability to*
> *ambulate effectively*, as defined in 1.00B2b.

*Id.* (emphasis added).  Thus, in order to meet Listing 1.04, Gerber must show compromise of a nerve root or spinal cord, *plus* the additional criteria set forth in subsections (A), (B), or (C).  While the 2017 MRI showed a herniated disk[8] with "mass effect on the L4 nerve root," Gerber points to no evidence of sensory or reflex loss, and the record evidence shows consistent negative straight-leg raising tests. Therefore, there is no evidence she meets all the criteria of Listing 1.04(A).  Likewise, Gerber points to no evidence of a diagnosis of spinal arachnoiditis, confirmed by a note, tissue biopsy, or imaging, and thus fails to show she meets all the criteria of Listing 1.04(B).  Finally, Gerber cannot show she meets all the criteria of Listing 1.04(C), as the record shows she could ambulate effectively.

It is Gerber's burden to prove she has an impairment or combination of impairments which medically equals a Listing.  *Lusk v. Comm'r of Soc. Sec.*, 106 F. App'x 405, 411 (6th Cir. 2004). Indeed, Gerber "must present specific medical findings that [her] impairment meets the applicable impairment or present medical evidence that describes how her impairment is equivalent to a listed

---

[8] Dorland's Medical Dictionary defines an extruded disk as "herniation of intervertebral disk . . . in which the nucleus pulposus protrudes through the anulus fibrosus and the nuclear material remains attached to the disk."  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 545 (30th Ed. 2003).

impairment."  *Id.  See also Blanton v. Social Sec. Adm.*, 118 F. App'x 3, 6 (6th Cir. 2004) ("It is a claimant's burden at the third step of the evaluation process to provide evidence that she meets or equals a listed impairment.").  Beyond citing to the 2017 MRI, Gerber offers no explanation as to how she meets or equals Listing 1.04.  (*See* Doc. No. 14 at 14-15.)  Thus, the Court finds the ALJ's conclusion Gerber did not meet or equal Listing 1.04 supported by substantial evidence.

While the ALJ may have erred in overlooking evidence of nerve root compression, that error was harmless considering Gerber fails to show she meets or medically equals the specific criteria set forth in Listing 1.04(A)-(C).  Accordingly, the Court recommends finding Gerber has not satisfied her burden of demonstrating the ALJ erred in finding she did not meet or equal Listing 1.04.

## C.    Third Assignment of Error: The RFC Lacks Substantial Evidence

Gerber argues the ALJ failed to "build an accurate and logical bridge between the evidence documenting Gerber's disabling problems as set forth in the record, and the ALJ's RFC. The ALJ found that Gerber could perform work at the light level of exertion, but the evidence in this matter did not support his finding that she could stand and/or walk for six hours per day."  (Doc. No. 14 at 14.)  As stated *supra* at note two, the Commissioner's brief fails to address explicitly Gerber's RFC argument.[9] (*See* Doc. No. 16.)

The RFC determination sets out an individual's work-related abilities despite his or her limitations.  *See* 20 C.F.R. § 404.1545(a)(1).  A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner.  *See* 20 C.F.R.§ 404.1527(d)(2).  An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner."  *See* 20 C.F.R.§ 404.1527(d)(3).  As such, the ALJ bears the responsibility for assessing

---

[9] The Court notes the Commissioner asserted in the portion of his brief regarding Dr. Hartzfeld's opinion that "the ALJ observed that Plaintiff's examination findings and symptoms reports did not show a deterioration" and discussed 2018 medical records in support of that argument.  (Doc. No. 16 at 12.)

a claimant's RFC based on all the relevant evidence, 20 C.F.R. § 404.1546(c), and must consider all of a claimant's medically determinable impairments, both individually and in combination.  *See* SSR 96–8p, 1996 WL 374184 (SSA July 2, 1996).

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis."  *Fleischer*, 774 F. Supp. 2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 F. App'x 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")).  *See also* SSR 96–8p at *7, 1996 WL 374184 (SSA July 2, 1996) ("The RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")).  While the RFC is for the ALJ to determine, the claimant bears the burden of establishing the impairments that determine her RFC.  *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

It is well-established there is no requirement that the ALJ discuss each piece of evidence or limitation considered.  *See, e.g., Conner v. Comm'r*, 658 F. App'x 248, 254 (6th Cir. 2016) (citing *Thacker v. Comm'r*, 99 F. Appx. 661, 665 (6th Cir. May 21, 2004) (finding an ALJ need not discuss every piece of evidence in the record); *Arthur v. Colvin*, No. 3:16CV765, 2017 WL 784563, at *14 (N.D. Ohio Feb. 28, 2017) (*accord*).  However, courts have not hesitated to remand where an ALJ selectively includes only those portions of the medical evidence that places a claimant in a capable light and fails to acknowledge evidence that potentially supports a finding of disability.  *See e.g., Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis*); Germany–Johnson v. Comm'r of Soc. Sec.*,

26

313 F. App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports"). *See also Ackles v. Colvin*, No. 3:14cv00249, 2015 WL 1757474, at *6 (S.D. Ohio April 17, 2015) ("The ALJ did not mention this objective evidence and erred by selectively including only the portions of the medical evidence that placed Plaintiff in a capable light."); *Smith v. Comm'r of Soc. Sec.*, No. 1:11-CV-2313, 2013 WL 943874, at *6 (N.D. Ohio March 11, 2013) ("It is generally recognized that an ALJ 'may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding.'"); *Johnson v. Comm'r of Soc. Sec.*, No. 2:16-cv-172, 2016 WL 7208783, at *4 (S.D. Ohio Dec. 13, 2016) ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes.").

At Step Three, the ALJ determined the record evidence showed Gerber's "back disorder has not resulted in an inability to ambulate effectively, as defined in 1.00(B)(2)(b), since the claimant retains full range of motion of her lower extremities and is able to ambulate independently."  (Tr. 17.)

The entirety of the ALJ's discussion of the medical evidence in determining Gerber's RFC follows:

> In the months leading up to the time when the claimant quit her job as a licensed practical nurse, she was being treated for low back pain with narcotic pain medication and muscle relaxers (IF). On June 2, 2016, the claimant went for an initial evaluation with Paul Hartzfeld, M.D., a physician at the Neurosurgery and Spine Group (3F/6). Dr. Hartzfeld noted that the claimant had underwent a lumbar fusion in 2002, and an MRI had revealed the expected post-operative changes, along with a left-sided L3-L4 disc bulge. Upon physical exam, Dr. Hartzfeld found a moderate limitation in the range of motion of the lumbar spine, but noted a steady gait and negative straight leg raises. He diagnosed the claimant with lumbar degenerative disc disease with radiculopathy, and recommended a conservative treatment course of physical therapy and epidural shots (3F/7).

In October of 2016, Freeland Oliverio, D.O., the claimant's primary care physician, diagnosed the claimant with neuropathy and started her on gabapentin (7F/3). The claimant continued to have some pain and limited motion in her lumbar spine. However, her examinations were largely unremarkable throughout 2016 (8F). In March of 2017, the claimant told Dr. Oliverio that her pain had improved since she stopped working and began physical therapy, but still had some problems with her left leg (9F/1).

In June of 2017, the claimant had an MRI of her lumbar spine that revealed retrolisthesis and worsening degenerative changes. Dr. Hartzfeld recommended a L3 laminectomy with L3-L4 discectomy and an extension of the existing fusion to the L3-L4 level (13F/6). However, the claimant has yet been unable to get insurance clearance for this procedure (13F/3). In the meantime, the claimant has had some symptom relief with acupuncture (12F). At her most recent visit with Dr. Hartzfeld in March of 2018, the claimant continued to have a normal gait, full strength in her extremities, and negative straight leg raises (13F/3).

(*Id.* at 18-19.)

For the following reasons, the Court finds the ALJ failed to address meaningfully the medical evidence regarding Gerber's impairments.  While the ALJ discussed some of the medical evidence at Step Three and in determining Gerber's RFC, the decision failed to address the consistent complaints of leg numbness and weakness and positive findings of tenderness documented by her treating physician. In addition, the ALJ misstated the evidence regarding Gerber's activities of daily living ("ADLs").

Gerber complained of leg numbness to her treating providers since April 2016 (*id.* at 214, 241, 266, 274, 341, 334, 338), yet the ALJ failed to mention leg numbness in his discussion of the record evidence. (*Id.* at 18-19).  The ALJ's discussion of the record evidence also omitted any mention of Gerber's persistent complaints of leg weakness (*id.* at 241, 248, 253, 274, 290, 320, 323, 334, 338), or her complaints of burning pain in her leg.  (*Id.* at 268.)  The ALJ likewise failed to mention the multitude of examinations finding tenderness in Gerber's spine.  (*Id.* at 206, 214, 261, 268, 272, 290, 349.)  Furthermore, in his discussion of Gerber's June 2017 visit with Dr. Hartzfeld where Dr. Hartzfeld

28

recommended a second surgery, the ALJ failed to mention Dr. Hartzfeld's conclusion that Gerber had a "large disk herniation."  (*Id.* at 342.)

A review of the decision reveals the ALJ devoted a total of three paragraphs to review the medical records concerning Gerber's physical limitations in his RFC analysis.  (*Id.* at 18-19.)  Within this scant discussion of the medical evidence, the ALJ overlooked all references to findings of tenderness on examination, and by lumping all the medical evidence into these three paragraphs, glossed over the consistent reports of leg numbness and weakness and other positive findings in the treatment notes.  Again, while an ALJ need not discuss every piece of evidence, here the ALJ only mentioned certain evidence which supported the RFC while failing to acknowledge or evaluate record evidence that did not.  As noted *supra*, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer*, 774 F. Supp. 2d at 877 (quoting *Sarchet*, 78 F.3d at 307).  *See also Shrader*, 2012 WL 5383120, at *6 ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked.").

Compounding the ALJ's errors in evaluating the medical evidence is the ALJ's mischaracterization of Gerber's ADLs.  The ALJ included the following discussion of Gerber's activities in his RFC analysis:

> The claimant testified that she is able to go grocery shopping once per week, but that her husband carries the groceries. She testified that she does laundry, cooks, and mends clothes. She testified that she regularly goes to visit her mother and children, and that she sometimes goes to sporting events for her grandchildren. The claimant testified that she is able to drive, and goes to business dinners with her husband on occasion. Regarding her last job, the claimant testified that she had to quit nursing because she was unable to be on her feet as required (Hearing).

(Tr. 18.)

But this discussion omits Gerber's testimony that when she is sitting and reading or mending clothes, she is sitting in her recliner with her legs elevated to hip height. (*Id.* at 38.) She testified that while she "sometimes" cooks, her husband does most of it. (*Id.* at 36.) While she regularly visits her mother and her children, her mother lives five minutes away and her children live 20 minutes away. (*Id.* at 37.) Furthermore, she testified she had "been to one, a couple" of her husband's business dinners. (*Id.*) Again, while the ALJ need not mention every piece of evidence, the ALJ cannot omit discussion of contrary lines of evidence.

Accordingly, for all the foregoing reasons, the Court recommends finding the ALJ committed reversible error in his RFC analysis.

## D.     Fourth Assignment of Error: Subjective Symptom Evaluation

Gerber argues the ALJ's credibility finding lacked substantial evidence as the ALJ "ignored any statement or finding which would have precluded Gerber from performing work at the light level of exertion." (Doc. No. 14 at 17.) The Commissioner responds the ALJ "reasonably assessed" Gerber's subjective symptoms, and Gerber has failed to show the discussion of her symptoms was patently wrong. (Doc. No. 16 at 18.) Therefore, the Commissioner argues the ALJ's subjective symptom evaluation should be upheld. (*Id.*)

When a claimant alleges symptoms of disabling severity, an ALJ must follow a two-step process for evaluating these symptoms. *See, e.g., Moore v. Comm'r of Soc. Sec.*, 573 F. App'x 540, 542 (6th Cir. Aug. 5, 2014); *Massey v. Comm'r of Soc. Sec.*, 409 F. App'x 917, 821 (6th Cir. 2011). First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce a claimant's symptoms. Second, the ALJ "must evaluate the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those]

symptoms limit [the claimant's] capacity for work." 20 C.F.R. § 404.1529(c)(1). *See also* SSR 16-3p, 2016 WL 1119029 (March 16, 2016).

If the claimant's allegations are not substantiated by the medical record, the ALJ must evaluate the individual's statements based on the entire case record. The evaluation of a claimant's subjective complaints rests with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007) (noting that "credibility determinations regarding subjective complaints rest with the ALJ"). In evaluating a claimant's symptoms, the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record. Beyond medical evidence, there are seven factors that the ALJ should consider.[10] The ALJ need not analyze all seven factors but should show that he considered the relevant evidence. *See Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005); *Masch v. Barnhart*, 406 F. Supp. 2d 1038, 1046 (E.D. Wis. 2005). The ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms . . . and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, 2016 WL 1119029; *see also Felisky v. Bowen*, 35 F.2d 1027, 1036 (6th Cir. 1994) ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so."). While a reviewing court gives deference to an ALJ's credibility determination, "the ALJ's credibility determination will not be upheld if it is unsupported by the record or insufficiently explained." *Carr v. Comm'r of Soc. Sec.*, No. 3:18CV1639, 2019 WL 2465273, at *10

---

[10] The seven factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. *See* SSR 16-3p, 2016 WL 1119029, at *7.

(N.D. Ohio April 24, 2019) (citing *Rogers*, 486 F.3d at 248-49), *report and recommendation adopted by* 2019 WL 3752687 (N.D. Ohio Aug. 8, 2019).

As discussed above, the ALJ omitted the discussion of relevant medical evidence in his RFC analysis and mischaracterized Gerber's ADLs.  On remand, the ALJ will have an opportunity to revisit and reassess Gerber's credibility considering all relevant evidence in the record.

**E.      Fifth Assignment of Error: Step Five**

In her fifth assignment of error, Gerber argues the ALJ "disregarded any objective or subjective evidence" which showed she was incapable of standing or walking six hours a day, as required by light work.  (Doc. No. 14 at 18-19.)  Gerber asserts this constitutes harmful error, as if she was limited to sedentary work she would be found disabled under the Medical-Vocational Guidelines at 20 C.F.R. Pt. 404, Subpart P, App'x 2.[11]  (*Id.* at 19.)

The Commissioner asserts that Gerber's Step Five argument "is duplicative of her arguments regarding the weighing of Dr. Hartzfeld's opinion and symptom evaluation, and dependent on finding an error in those areas."  (Doc. No 16 at 18) (citing Gerber's brief).  As a result, the Commissioner rests on the earlier sections of his brief.  (*Id.* at 19.)

"When determining whether a person is entitled to disability benefits, the Commissioner follows a sequential five-step inquiry."  *Johnson v. Comm'r*, 652 F.3d 646, 651 (6th Cir. 2011) (citing 20 C.F.R. § 404.1520).  While the claimant bears the burden of proof at Steps One through Four, the burden shifts to the Commissioner at Step Five.  *Id.* (citing *Wilson v. Comm'r*, 378 F.3d 541, 548 (6th Cir. 2004)).  At the fifth step in the analysis, "the Commissioner must identify a significant number of jobs in the

---

[11] The Medical-Vocational Guidelines, or "grid rules," contain tables of rules which use a claimant's RFC, age, education, and work experience to, under certain circumstances, direct a determination of disabled or not disabled.  *See* 20 CFR Pt. 404, Subpt. P, App'x 2, Sec. 200.00(a).

economy that accommodate the claimant's [RFC] and vocational profile." *Id.* (citing *Wilson*, 378 F.3d at 548).

The Court agrees that Gerber's Step Five argument is dependent on a finding that the ALJ erred at earlier steps in the five-step sequential disability evaluation. As discussed above, the ALJ omitted the discussion of relevant medical evidence in his RFC analysis and mischaracterized Gerber's ADLs. Proper consideration of the relevant medical evidence and Gerber's ADLs may affect the ALJ's Step Five findings. On remand, the ALJ will have an opportunity to revisit and reassess his Step Five findings after reconsideration of the medical evidence and Gerber's ADLs.

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be VACATED AND REMANDED.

Date: November 7, 2019                          *s/ Jonathan Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**